UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HIWOT NEMARIAM, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 00-1392 (TPJ) |
| | ) | |
| THE FEDERAL DEMOCRATIC | ) | **FILED** |
| REPUBLIC OF ETHIOPIA, et al., | ) | |
| | ) | AUG 2 - 2001 |
| Defendants. | ) | NANC⌐ ...AYER WHITTINGTON, CLE⌐⌐ |
| | ) | U.S. DISTRICT COURT |

MEMORANDUM AND ORDER

Plaintiffs bring this action pursuant to the Foreign Sovereign Immunities Act ("FSIA")

against the Federal Democratic Republic of Ethiopia and the Commercial Bank of Ethiopia

("CBE") on behalf of themselves and all other persons of Eritrean origin who were allegedly

expelled from Ethiopia on or about June 12, 1998 and whose properties were expropriated by the

defendants. Plaintiffs assert jurisdiction under the international takings exception to the FSIA,

28 U.S.C. § 1605(a)(3). The matter is presently before the Court on the motion of defendants to

dismiss the complaint.

**I.**

The events giving rise to the case all occurred in the country of Ethiopia and resulted

from the long-standing tension between Ethiopia and its neighbor Eritrea. In 1993, following

thirty years of conflict, Eritrea seceded peacefully from Ethiopia through a referendum on

independence supervised by the United Nations, and in May, 1993, Eritrea was admitted as a

member of the U.N. Although Eritrea's secession was peaceful, the border between the two

countries was never clearly demarcated.  In May, 1998, a dispute over frontier land erupted into a violent border clash that escalated into a general armed conflict.  The events of the instant case occurred shortly thereafter, and the parties' contentions are sharply in controversy.

According to the plaintiffs, starting in June, 1998, Ethiopia began a campaign of identifying, detaining and expelling persons of Eritrean descent, including the plaintiffs.  On June 12, 1998, the Ethiopian government issued an order freezing the bank accounts of persons of Eritrean descent.  Ethiopia's Immigration Office assembled lists of "Eritreans" based on birth in Eritrea, membership in Eritrean organizations, or voting / eligibility to vote in the 1993 Eritrean referendum on independence.  Anyone appearing on those lists was classified as an "Eritrean" and could no longer claim Ethiopian citizenship.  The named plaintiffs were stripped of their Ethiopian citizenship, expelled from Ethiopia, and their property was expropriated solely on the ground that they are of Eritrean descent or nationality.  Both the U.S. and the U.N. condemned the mass expulsion of "Eritreans."

Prior to June 12, 1998, the named plaintiffs allege that they held bank accounts with the Commercial Bank of Ethiopia.  Plaintiffs assert that CBE has prevented plaintiffs from accessing their bank accounts as a result of the Ethiopian government's order of June 12, 1998.  Because Ethiopian banking regulations permit withdrawal of funds only when a passbook is presented in person by the account holder, plaintiffs contend that all personal accounts were de facto expropriated as a result of plaintiffs' expulsion from Ethiopia.[1]  According to plaintiffs, all

_____

[1]Plaintiffs say that defendant CBE is an agent or instrumentality of Ethiopia.  It was established in 1964 by an official proclamation of the Ethiopian government, acquired a commercial banking monopoly by 1974, and currently accounts for approximately 90% of all commercial banking activities in Ethiopia.

"Eritreans" who had bank accounts have been deprived of access to them.  The Ethiopian government also allegedly seized other property and subsequently auctioned it off for the benefit of the CBE and the government, without compensation to plaintiffs.  The above actions were only taken against "Eritreans," not any other ethnic or political group.

On June 18, 2000, Ethiopia and Eritrea signed a cease fire agreement, and on December 12, 2000, they signed a peace agreement formally ending the conflict and setting up a claims commission (the "Claims Commission") to hear claims for loss, damage, or injury arising out of the conflict.[2]

## II.

Defendants filed a motion to dismiss on November 17, 2000.  Defendants dispute many of the factual allegations of the complaint.  Defendants allege that during the hostilities both Ethiopia and Eritrea took steps to identify persons within their borders who were considered dangerous because of their political activity and / or support for the other country's war efforts. Defendants contend that people of Eritrean origin may and do continue to live peacefully in Ethiopia and that those who were expelled were spying for Eritrea or otherwise supporting Eritrean aggression.  Defendants contend that the Ethiopian government has never issued an

---

[2]In their two-count complaint filed on June 27, 2000, the named plaintiffs, four Eritreans expelled from Ethiopia in 1998, assert that these actions amount to a taking in violation of international law and a taking in conjunction with mass expulsions.  Plaintiffs filed their First Amended Complaint on June 8, 2001 adding two plaintiffs–one named and one listed as "John A."  On that same date, plaintiffs also filed a motion for John A. to proceed anonymously.

Plaintiffs seek to represent a purported class of 70,000 that would consist of persons whose bank accounts and other property in Ethiopia have been expropriated in violation of international law and (1) who are of Eritrean origin, descent, or nationality, or (2) whom Ethiopia otherwise treated as Eritrean.

order freezing the bank accounts of all persons of Eritrean origin nor has CBE taken any action to

freeze accounts belonging to Eritreans.  Defendants submit an affidavit from the Legal Counselor

for the CBE concerning the status of various CBE bank accounts of the named plaintiffs, noting

that they are not frozen and can be accessed by the holders or their personal representatives.  See

Defs' Ex. A, ¶ 26.

Irrespective of the truth or falsity of the plaintiffs' allegations, however, defendants argue

that the case should be dismissed because: (1) the expropriation exception to the FSIA does not

apply; (2) defendants lack sufficient minimum contacts with the forum for personal jurisdiction;

(3) the act of state doctrine requires dismissal of the complaint; (4) the complaint should be

dismissed for forum non conveniens; and (5) the Court should abstain from entertaining this

action because of the ongoing peace process and negotiations.  The abstention argument is now

moot because the peace negotiations have been completed.

Plaintiffs filed their opposition on February 16, 2001, contending that subject matter

jurisdiction is proper under the FSIA, that personal jurisdiction is not necessary, that the doctrine

of forum non conveniens is not apposite, and that the act of state doctrine does not apply.

### III.

The Court observes that jurisdictional facts in this case are in dispute; thus a decision as

to whether the Court has subject matter jurisdiction is premature.[3]  The D.C. Circuit has held that

a trial court should "consider other potentially dispositive jurisdictional defenses before allowing

FSIA discovery."  In re Papandreou, 139 F.3d 247, 254 (D.C. Cir. 1998).  Forum non conveniens

---

[3]Similarly, a decision as to personal jurisdiction, which under the FSIA is linked to
subject matter jurisdiction, is also premature.  See 28 U.S.C. §1330.

is a potentially dispositive jurisdictional defense; the act of state doctrine is not. See id.

As the Supreme Court has noted, "[t]he *forum non conveniens* determination is committed to the sound discretion of the trial court." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257 (1981). A district court may dismiss a case on the ground of forum non conveniens

> when an alternative forum has jurisdiction to hear a case, and when trial in the chosen forum would "establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience," or when the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems."

Id. at 241 (quoting Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)) (omissions in original). Courts generally balance the interests of plaintiffs, defendants, and the court in an effort to weigh the relative convenience of the chosen forum against the convenience of an alternative forum that also has jurisdiction over the parties and the subject matter of the suit.

In deciding a forum non conveniens motion, courts in the D.C. Circuit apply a four-part test. See Pain v. United Technologies Corp., 637 F.2d 775, 784-85 (D.C. Cir. 1980). First, the court determines whether an adequate alternative forum exists. "Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." Piper, 454 U.S. at 254 n.22 (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506-07 (1947)). "A foreign forum is not inadequate merely because it has less favorable substantive law, because it employs different adjudicative procedures, or because of general allegations of corruption in the judicial system." El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 678 (D.C. Cir. 1996) (internal citations omitted). In rare situations, however, when "the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." Piper, 454 U.S. at 254 n.22. The defendant "bears the burden of proving that there is an adequate alternative forum." El-Fadl,

75 F.3d at 677.

Second, if the court concludes that an adequate alternative forum exists, it weighs a number of "private interests factors" to determine whether the relative convenience of the alternative forum overrides the general presumption in favor of plaintiff's choice of forum, a presumption that is diminished in a case involving foreign plaintiffs. See Piper, 454 U.S. at 256 ("Because the central purposes of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.")  The private interest factors of the litigants include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Gilbert, 330 U.S. at 508.

Third, if the private interests are in "equipoise or near equipoise," the court considers several "public interest factors" to determine whether the public interest would be served by allowing the case to go forward in the alternative forum.  These public interest factors include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Piper, 454 U.S. at 241 n.6 (quoting Gilbert, 330 U.S. at 509).

Fourth, if the court concludes that the alternative forum is adequate and the private and public interests weigh in favor of the alternative forum, the court must ensure that the plaintiffs

would be able to "reinstate their suit in the alternative forum without undue inconvenience or prejudice." <u>Pain</u>, 637 F.2d at 785.

Defendants argue that the case should be dismissed on <u>forum non conveniens</u> grounds in favor of the international Claims Commission established by Ethiopia and Eritrea to decide the economic claims of individuals in both countries resulting from the dislocations and fighting between 1998 and 2000. It is clear to the Court that the Claims Commission is an adequate alternative tribunal that is more convenient and capable of handling the claims in this case.

The Claims Commission was established under Article 5 of the December 12, 2000 Agreement Between the Government of the Federal Democratic Republic of Ethiopia and the Government of Eritrea (the "Peace Agreement"). Article 5 provides that:

> [t]he mandate of the Commission is to decide through binding arbitration all claims for loss, damage or injury by one Government against the other, and by nationals (including both natural and juridical persons) of one party against the Government of the other party or entities owned or controlled by the other party that are (a) related to the conflict that was the subject of the Framework Agreement, the Modalities for its Implementation and the Cessation of Hostilities Agreement, and (b) result from violations of international humanitarian law, including the 1949 Geneva Conventions, or other violations of international law.

Art. 5, ¶ 1. The Commission consists of five arbitrators: two were selected by each country and the fifth was selected by the other four. The five chosen arbitrators all are extremely distinguished international law specialists with experience in human rights law and international claims commissions. <u>See</u> Yimer Decl., Ex. 7. The Commission is located in the Hague and is empowered to employ its own professional staff and adopt its rules of procedure based on the 1992 Permanent Court of Arbitration Optional Rules for Arbitrating Disputes Between Two States. <u>See</u> Art. 5, ¶ 5-7. The Commission is also empowered to hold hearings and

investigations in the territory of Ethiopia or Eritrea or other locations. See Art. 5, ¶ 5.

Claims shall be submitted to the Commission by each country on its own behalf and on behalf of its nationals, and "[i]n appropriate cases, each party may file claims on behalf of persons of Ethiopian or Eritrean origin who may not be its nationals. Such claims shall be considered by the Commission on the same basis as claims submitted on behalf of that party's nationals." Art. 5, ¶ 9. The claims of the plaintiffs in this case can all be brought by Eritrea: all of the plaintiffs are "persons of Ethiopian or Eritrean origin," and three of the named plaintiffs state that they are now citizens of Eritrea. All claims must be filed no later than December 12, 2001, which allows plaintiffs sufficient time to present their claims to Eritrea for filing. See Art. 5, ¶8.

Plaintiffs contend that Claims Commission expressly contemplates allowing the instant claims to proceed before this Court, and it should therefore do so. The Agreement provides that:

> [e]xcept for claims submitted to another mutually agreed settlement mechanism in accordance with paragraph 16 or filed in another forum prior to the effective date of this Agreement, the Commission shall be the sole forum for adjudicating claims described in paragraph 1 or filed under paragraph 9 of this article, and any such claims which could have been and were not submitted by that deadline shall be extinguished, in accordance with international law.

Art. 5, ¶ 8 (emphasis supplied). Although the claims in this case were "filed in another forum [i.e., this District Court] prior to the effective date of this Agreement," the Agreement does not preclude plaintiffs' claims from being re-filed with the Commission. The Agreement simply admits of concurrent jurisdiction–it does not render this Court an exclusive forum for them.

The Commission is authorized to adopt methods of efficient case management and mass claims processing that it deems appropriate. See Art. 5, ¶ 10. The Commission has already

commenced its work, holding an initial meeting with both sides on March 27, 2001, asking for submission of the parties' positions on various issues, and setting future dates. See Yimer Decl., Ex. 10. Eritrea has submitted a letter to the Commission indicating its intent to prepare tens of thousands of claims addressing, among other issues, the deportation and denationalization of Ethiopian citizens due to their Eritrean origins, and the seizure and misappropriation of civilian- and government-owned property. See Yimer Decl. Ex. 11; Brilmayer Decl. ¶ 21. These claims would encompass the claims at issue in this case. Eritrea has also stated its position that "Ethiopian citizens of Eritrean ethnic or national origin who were illegally denationalized, deported, and expelled from Ethiopia must be ensured the right to return to their homes in order to claim their property. Documentation which was systematically seized upon the injured parties' unlawful imprisonment and expulsion must be returned to them immediately in order to facilitate processing of their claims." See Yimer Decl. Ex. 11.

The plaintiffs contest the availability and object to the adequacy of the Claims Commission on the grounds that, as a global settlement of these issues, individuals may not have the opportunity to fully assert their claims; the claims are asserted by the respective governments, so it is at Eritrea's discretion whether to espouse any particular individual's claim.[4] The Court observes that each government has no incentive not to espouse as many meritorious claims as possible before the Commission. Plaintiffs also argue that Eritrea will likely prioritize human rights claims, and that "claims of purely financial injuries, including the taking of property, will be given less emphasis." See Brilmayer Decl. at ¶33. However, Eritrea has "stated its intention

---

[4]An analogous concern about individual representation, however, could be raised with respect to the Rule 23 class representation plaintiffs propose for themselves before this Court.

to pursue the claims of individuals expelled and denationalized by Ethiopia, as well as claims of taking of property, requesting financial compensation and other relief." See id. at ¶21. Plaintiffs also express concern that any settlement might be in the form of a set-off between the two countries, but they point to nothing in the record to suggest that the Commission contemplates a "set off" remedy.

The government of Eritrea is represented before the Claims Commission by a member of a well-respected United States law firm on boundary issues and by a Yale Law School professor, Lea Brilmayer, and her deputy on claims procedures. Arguments that counsel is inadequate appear to be misplaced. Plaintiffs argue that Eritrea (and its counsel) lack sufficient resources to adequately present the claims and in particular lack the resources of plaintiffs' counsel to pursue the claims at issue in the instant case. This Court is unaware of anything in the Peace Agreement or Claims Commission procedures that would prevent counsel in the instant case from assisting Professor Brilmayer and her team in working on claims to present to the Claims Commission.

Defendants have demonstrated that the Claims Commission is an adequate alternative forum. Even if compensation under the Claims Commission proves different than it might be in a U.S. court, this is not a case where the "remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." Piper, 454 U.S. at 254.

Once defendants have established that there is an adequate alternative forum, this Court examines whether the private and public interest factors set forth by the Supreme Court in Gilbert favor resolution of these claims in this Court or in the alternative forum. The factors weigh decisively in favor of the Claims Commission.

Private interest factors to be considered include access to sources of proof, availability of

-10-

compulsory process, cost of obtaining witnesses, possibility of viewing the premises, and other miscellaneous problems with the chosen forum.  See Gilbert, 330 U.S. at 508.  All of the events at issue in this case occurred in Ethiopia, and the vast majority of plaintiffs, witnesses, and evidence are located in Eritrea and / or Ethiopia.  None of the named plaintiffs is a U.S. citizen, and only one is a lawful permanent resident.  The potential witnesses located abroad are not likely to be subject to compulsory process from this Court, and the cost of bringing witnesses and evidence to this country and arranging for translators would be substantial.  The Claims Commission, on the other hand, can hold hearings in Eritrea and / or Ethiopia, and will already be making appropriate logistical arrangements for taking evidence situated within, and for coping with language differences.

Public interest factors include administrative difficulties for the courts, local interest in having local controversies decided at home, and familiarity with the substantive law governing the case.  See Gilbert, 330 U.S. at 508-509.  As noted above, the location of witnesses and evidence and the need for translators would pose serious administrative problems for this Court, and would entail significant expense in trying the case here.  The District of Columbia as an entity has no interest in the case—none of the parties is a citizen of the U.S. or resident of this district, and the events at issue in this case are in no way "local" to either D.C. or the United States.[5]  The law to be applied in this case is substantive international law, a source of law that the U.S. District Courts do not apply on a regular basis.  In contrast, the Claims Commission is specifically charged with applying the relevant rules of international law, see Art. 5, ¶ 13, and all

---

[5]At this stage, whether some potential class members are U.S. citizens or D.C. residents is irrelevant.  None of the named plaintiffs is either.

of the commissioners have extensive experience in the field.  Moreover, they will already be

examining the specific problems at issue in this case and possess experience in handling mass

claims.

For the foregoing reasons, the Court concludes that this case should be dismissed on

forum non conveniens grounds in favor of the Claims Commission in the Hague, and it is, this

*2nd* day of August, 2001,

ORDERED, that defendants' motion to dismiss the complaint is granted; and it is

FURTHER ORDERED, that the case is dismissed without prejudice in favor of the

Claims Commission in the Hague as an alternative forum; and it is

FURTHER ORDERED, that the case is subject to reinstatement for good cause shown if

named plaintiffs' claims are not submitted to the Claims Commission by the government of

Eritrea despite affirmative, timely request therefore by plaintiffs; and it is

FURTHER ORDERED, that plaintiffs' motion for John A. to proceed anonymously is

denied as moot.

Thomas Penfield Jackson
U.S. District Judge