# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| HIWOT NEMARIAM, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )        Civil Action No. 00-1392 (RBW) |
| | ) |
| THE FEDERAL DEMOCRATIC | ) |
| REPUBLIC OF ETHIOPIA, <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |

_____

## MEMORANDUM OPINION

The plaintiffs, individuals of Eritrean origin, descent, or nationality, bring this action

against the Federal Democratic Republic of Ethiopia and the Commercial Bank of Ethopia

("CBE") for the alleged unlawful takings of their property and their mass expulsion from

Ethiopia in violation of international law pursuant to the expropriation exception to the Foreign

Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330(a), 1605(a)(3) (2000).[1]  Complaint

---

[1]  This case has a protracted history.  This action was commenced on June 12, 2000, and was initially assigned to a former member of this Court.  In November of that year, the defendants filed a motion to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction.  On August 2, 2001, the original judge assigned to this case dismissed this action on the ground of <u>forum non conveniens</u> in favor of the Eritrea-Ethiopia Claims Commission  ("EECC").  The District of Columbia Circuit, however, reversed, holding that the EECC was not an adequate forum for the presentation of the plaintiffs' claims.  <u>Nemariam v. Ethiopia</u>, 315 F.3d 390, 394-95 (D.C. Cir. 2003), <u>cert. denied</u>, 124 S.Ct. 278 (Oct. 6, 2003).  In September 2003, jurisdictional discovery commenced, but was not completed due to various discovery disputes that are the subject of other motions pending before this Court. Despite the discovery disputes, this Court directed the defendants to file a renewed motion to dismiss.  This new motion became ripe for resolution in May 2004, however, the parties continued to file supplemental memoranda addressing additional legal issues.  On October 7, 2004, this case was reassigned to this Court.  However, the pending dispositive motion had not yet been resolved.  Based upon the papers before the Court at that time, and those that were expected to be filed, in order to properly review the defendants' motion to dismiss this Court would have been required to sift through no less than eight different briefs (and accompanying exhibits), each espousing evolving legal positions and theories based upon new evidence.  Accordingly, this Court ordered the parties to resubmit their papers, incorporating all of their respective arguments into one set of pleadings.  These resubmitted papers are the subject of this opinion.

("Compl.") ¶¶ 10-11, 117-122.  Currently before the Court is the Defendants' Refiled Motion to

Dismiss for Lack of Jurisdiction.[2]  For the reasons set forth below, this Court grants the

defendants' motion.

## I.   Background

In 1993, Eritrea seceded peacefully from Ethiopia following a referendum on

independence.  Compl. ¶ 2.  However, in May 1998, a long-standing border dispute between the

two nations erupted into an armed conflict, which lasted approximately two years.  Id.  As part of

this conflict, the plaintiffs allege that in June 1998, "Ethiopia began a practice of systematic and

discriminatory expulsions of persons of Eritrean origin, descent or nationality living in its

territory."  Id. ¶ 3.  Specifically, the plaintiffs opine that at some point around June 12, 1998, an

Ethiopian government spokesperson announced that Ethiopia's security apparatus had uncovered

lists of Eritreans living in Ethiopia "who were engaged in spying and mobilizing financial and

other resources to support the Eritrean aggression."  Id. ¶ 46.  Moreover, the Ethiopian

government announced that any Eritrean who fell within this category of individuals would be

required to leave Ethiopia.  Id.  Following this pronouncement,

> the Ethiopian Ministry of Foreign Affairs represented to the international community that
> deportations would follow a three-part process:  (i) determination of which Ethiopians of
> Eritrean descent were in fact Eritrean citizens; (ii) determination of which categories of
> alien Eritreans constituted a national security risk; and (iii) deportation of such
> individuals, fully representing due process and the right of appeal, preserving their
> property rights, and abiding by international human rights law.

---

[2]  Specifically, the following papers have been submitted to this Court in connection with this motion:  (1)
the Defendants' Memorandum of Law in Support of Refiled Motion to Dismiss for Lack of Jurisdiction ("Defs.'
Mem."); (2) Corrected Memorandum of Points and Authorities in Opposition to Defendants' Refiled Motion to
Dismiss ("Pls.' Opp'n"); and (3) Defendants' Reply Memorandum of Law in Support of Refiled Motion to Dismiss
for Lack of Jurisdiction ("Defs.' Reply").  The parties have also submitted a substantial number of exhibits in
support of their positions.

Id. ¶ 47.   However, according to the plaintiffs, this process was not followed.  Rather, Ethiopia

"began a campaign of mass expulsion of persons of Eritrean origin, descent, or nationality

without notice or due process."  Id. ¶ 48.  As the Ethiopian government began the process of

expelling individuals of Eritrean origin, descent, or nationality, the plaintiffs allege that the

Ethiopian government issued an order freezing the bank accounts of those individuals, and seized

their funds along with other property.  Id. ¶¶ 54-56.

The plaintiffs in this action all recount similar accounts of how the Ethiopian government

practices impacted them.  For example, many were arrested in their homes or at their place of

business by armed police and military officials, id. ¶¶ 58, 71, 76, 85, 96, they were transported

and held in detention facilities for anywhere from a few hours to a few days, id. ¶¶ 59, 72, 77, 86,

97, and each was eventually loaded onto a bus and transported to the Ethiopia border, id. ¶¶ 60,

73, 79, 87.  According to the plaintiffs, in connection with their deportations, Ethiopia and its

agents, including the CBE, engaged in a systematic effort to seize the property of the deportees,

including seizing or freezing the deportees' bank accounts and foreclosing on their properties and

businesses.  Id. ¶¶ 54-56.  In many instances, the plaintiffs' property was sold at auctions.  Id. ¶

56.

The plaintiffs claim that their property was taken in a number of different ways.  First, the

plaintiffs claim that the Ethiopian government ordered that their bank accounts be "frozen," and

thus the accounts became completely unaccessible.  Id. ¶¶ 54, 69, 89.  Some plaintiffs claim that

although some family bank accounts were not frozen, they were permitted to withdraw only

small amounts of their funds.  Id. ¶ 80, 106.  In addition, the plaintiffs posit that their bank

accounts were, in every practical aspect, taken from them once they were deported from Ethiopia

because they were completely deprived of the ability to access their funds.  Specifically, the plaintiffs note that under Ethiopian banking law, holders of bank accounts must appear in person to withdraw funds because there are no automated tellers, wire transfers are not permitted, and checking accounts are illegal.  Id. ¶ 61.  Accordingly, once an individual is deported, the plaintiffs claim that they are totally deprived of access to the funds in their accounts.  Id. ¶¶ 61, 75, 83-84, 90-94, 100-102, 105-06.  Finally, the plaintiffs contend that the businesses and other real property owned by the plaintiffs were taken and in many cases sold substantially below their market value.  Id. ¶¶ 63, 82-83, 91-93, 101.  Many of these sales allegedly occurred under the pretext that the property was burdened by a tax debt or that the mortgages were in default.  Id.  It appears, according to the plaintiffs, that the proceeds from these sales were deposited into bank accounts at the CBE in the plaintiffs' names.  Pls.' Opp'n at 16.

On June 18, 2000, the Governments of Ethiopia and Eritrea signed an Agreement of Cessation of Hostilities, which ended the border war.  Id. ¶ 24.  And on December 12, 2000, the two nations signed a Peace Agreement providing for the permanent termination of military hostilities and the repatriation of prisoners of war and other detainees.  Id.  Among the provisions of the Peace Agreement was the creation of a Claims Commission, whose mandate was to decide any claims for loss, damage, or injury relating to the conflict and resulting from a violation of international law alleged by either nation.  Id. ¶¶ 43-44.  Although the Claims Commission was established as the exclusive forum for claims arising from the conflict between the two nations, the Peace Agreement specifically provided for the continuance of claims that were filed in another forum before December 12, 2000.  Id. ¶ 44.  On December 12, 2001, Eritrea filed 32 claims with the Claims Commission, including those claims at issue in this litigation.  Defs.'

Mem. at 8-9.  On December 17, 2004, the Claims Commission issued a partial award, which

represented the Claims Commission's final determination on liability and certain other issues,

with only the determination of damages remaining for disposition in further proceedings.  Id. at

10.  Specifically, the defendants point out that this ruling addresses those claims being pursued

by the plaintiffs in this action.  Id.

## II.   Standard of Review

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to

dismiss that challenge a court's subject matter jurisdiction, "[t]he plaintiff bears the burden of

persuasion to establish subject matter jurisdiction by a preponderance of the evidence."  Pitney

Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  In reviewing

such a motion, this Court must accept as true all the factual allegations contained in the

complaint.  Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S.

163, 164 (1993).  Additionally, in deciding a Rule 12(b)(1) motion, it is well-established in this

Circuit that a court is not limited to the allegations in the complaint, but may also consider

material outside of the pleadings in the court's effort to determine whether it has jurisdiction in

the case.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir.

1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992); Haase v. Sessions,

835 F.2d 902, 906 (D.C. Cir. 1987); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185

F. Supp. 2d 9, 14 (D.D.C. 2001).

## III.   Legal Analysis

### A.   The Foreign Sovereign Immunities Act ("FSIA")

The FSIA is "'the sole basis for obtaining jurisdiction over a foreign state in our courts.'"

Peterson v. Royal Kingdom of Saudi Arabia, 332 F. Supp. 2d 189, 195 (D.D.C. 2004) (quoting

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).  "The basic

premise of the FSIA is that foreign sovereigns are immune from suit in the United States unless

the action falls under one of the specific exceptions enumerated in the statute."  Id. (citing 28

U.S.C. § 1604).  Once a defendant presents a prima facie case that it is a foreign sovereign, a

plaintiff "bear[s] the burden of producing evidence to show that there is no immunity and that the

court therefore has jurisdiction over the claims."  Daliberti, 97 F. Supp. 2d at 42 (citing Drexel

Burnham Lambert Group Inc. v. Comm. of Receivers for Galadari, 12 F.3d 317, 325 (2d

Cir.1993); Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2nd Cir.1993)).  "If

the foreign sovereign is not immune, the federal district courts have exclusive jurisdiction over

the action."  Peterson, 332 F. Supp. 2d at 195 (citing 28 U.S.C. §§ 1330, 1604; Daliberti v.

Republic of Iraq, 97 F. Supp. 2d 38, 42 (D.D.C. 2000)(citation omitted); Saudi Arabia v. Nelson,

507 U.S. 349, 355 (1993)).

     A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt

that plaintiffs can prove no set of facts in support of their claims that would entitle them to relief.

Id. at 42-43 (citing Neitzke v. Williams, 490 U.S. 319, 326-27 (1989) (quoting Hishon v. King &

Spalding, 467 U.S. 69, 73, (1984)); Kowal, 16 F.3d at 1276.  At the stage of the proceedings this

case is in, the Court must accept as true all facts alleged by the plaintiffs.  Daliberti, 97 F. Supp.

2d at 43. "[T]he question is whether the facts alleged are sufficient to establish the jurisdiction of

this Court under an exception to immunity under the FSIA and is sufficient to state a claim upon

which relief may be granted."  Id.

     Here, the plaintiff contends that § 1605(a)(3) of the FSIA provides a basis for this Court

to exercise jurisdiction over this matter.  Compl. ¶ 10.  This provision is commonly referred to as

the expropriation exception.  The provision allows claims to be pursued in federal court against

foreign sovereigns in cases

> in which rights in property taken in violation of international law are in issue and that
> property or any property exchanged for such property is present in the United States in
> connection with a commercial activity carried on in the United States by the foreign state;
> or that property or any property exchanged for such property is owned or operated by an
> agency or instrumentality of the foreign state and that agency or instrumentality is
> engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  For this exception to foreign sovereign immunity to apply, "a court must

find that: (i) rights in property are at issue; [and] (ii) those rights were taken in violation of

international law; . . ."  Peterson, 332 F. Supp. 2d at 196.  Additionally, the court must find that a

"jurisdictional nexus between the expropriation and United States" exists.  Id. at 197.  This nexus

can be established "by showing that the property at issue or any property exchanged for it: (a) 'is

present in the United States in connection with a commercial activity carried on in the United

States by the foreign state,' or (b) 'is owned or operated by an agency or instrumentality of the

foreign state and that the agency or instrumentality is engaged in commercial activity in the

United States.'"  Id. (quoting 28 U.S.C. § 1605(a)(3)); Lord Day & Lord v. The Socialist

Republic of Vietnam, 134 F. Supp. 2d 549, 560 (S.D.N.Y. 2001).  Here, the plaintiffs claim they

have satisfied the latter jurisdictional nexus.  Pls.' Opp'n at 24-31.  For the reasons that follow, it

is clear that the plaintiffs cannot establish the means for at least two reasons.  Accordingly, their

claims must be dismissed.

### 1.    Are "Rights in Property" at Issue?

As an initial matter, "[c]ourts considering the expropriation exception have held that it

only applies where the property at issue is 'tangible property,'" i.e., physical assets that can be touched and seen, as opposed to intangible assets, which lack a physical existence. Peterson, 332 F. Supp. 2d at 197 (quoting Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, No. 94 Civ.1942 (KMW) (AJP) 1996 WL 413680 at *8 (S.D.N.Y. July 24, 1996)).   Indeed, courts have held that "[p]roperty taken within the meaning of the statute means 'physical property' not the right to receive payment." Lord Day, 134 F. Supp. 2d at 560 (quoting Hirsh v. State of Israel, 962 F. Supp. 377, 383 (S.D.N.Y.1997) (citing Canadian Overseas Ores Ltd. v. Compania de Acero, 528 F. Supp. 1337 (S.D.N.Y.1982) (holding that contractual rights to payment, absent an expropriation of real property, do not constitute "property" within the meaning of the FSIA)).

        The defendants argue that the property at issue in this case — bank accounts — are not properly characterized as tangible property because they are merely contract rights and the right to receive payment. Defs.' Mem. at 16-17.   Thus, the defendants contend that because tangible property rights are not at issue, the FSIA does not provide a basis for this Court to exercise subject matter jurisdiction over this action. Id. at 17.   Specifically, the defendants opine that the property in question here is not cash, but rather, under Ethiopian law, "[t]he contract of deposit of funds renders the bank owner of the funds deposited, irrespective of the mode of deposit." Id. at 21-22 (quoting Eth. Commercial Code, Art. 896).   Accordingly, the defendants contend that the plaintiffs merely own contract rights to obtain their deposited funds at a later time.   Thus, argues the defendants, this case does not involve tangible property. Defs.' Reply at 7-8.   The plaintiffs counter that the FSIA on its face references only "property" in a general sense, which should be interpreted to include contract rights and other intangible property. Pls.' Opp'n at 21.   In any event, the plaintiffs opine that even if this Court were to conclude that the FSIA does not protect

intangible property, and bank accounts are deemed intangible property, because the plaintiffs have the right to withdraw their funds at any time, they have a greater level of control over their accounts and thus more than a mere expectation interest in the funds.  Id. at 22.

Many courts, including this one, have examined whether property is tangible or intangible for purposes of the FSIA.  In Peterson v. Royal Kingdom of Saudi Arabia, 332 F. Supp. 2d 189 (D.D.C. 2004), another member of this Court concluded that an expectation interest in employer contributed funds to a pension account amounted to intangible property that was not protected under the FSIA.  Id. at 197.  In so finding, the court noted that the plaintiff "could not cash the account in at anytime and most likely could not borrow against it or bequeath it to his heirs," id.; rather, the contributions in the pension fund were merely a contract right to receive payment at some later point in time.  Id.; see Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 751 (S.D.N.Y. 2004) (noting that "[w]hile a straightforward confiscation of cash may be 'taking' of 'rights in property' under the FSIA, that is clearly contrary to the allegations plaintiffs propounded elsewhere in their Complaint — that they had purchased . . . .[the vouchers] and options for investment purposes."); Hirsh v. State of Israel, 962 F. Supp. 377, 383 (S.D.N.Y. 1997) (finding that the right to receive reparation payments pursuant to the Luxembourg Agreement are "intangible rights," and thus not protected by the FSIA).   In fact, this Court, in a recent opinion, acknowledged, "[a]s the prevailing case law holds, the FSIA applies where the property at issue is 'tangible property.'" Rong v. Liaoning Provincial Government, 362 F. Supp. 2d 83, 101 (D.D.C. 2005) (citing Perterson, 332 F. Supp. 2d at 197).[3]  Thus, this Court concludes

_____

[3]  However, in Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia, 616 F. Supp 600, 663 (W.D. Mich. 1985), the district court, while recognizing that the FSIA protects only tangible property, found that a government's taking of a controlling interest in the stock of a company amounted to the taking

that the FSIA is not implicated when intangible property is the object of the dispute.

The Court must now address whether a bank account properly qualifies as tangible or intangible property.  While the parties have been unable to present this Court with legal authority directly on-point, and this Court has been unable to find any, the Court is not completely without guidance.  First, the Ethiopian Commercial Code of 1960, which governs the relationship between an Ethiopian bank and its depositors is helpful.  Article 896 of the Ethiopian Commercial Code states:  "The contract of deposit of funds renders the bank owner of the funds deposited, irrespective of the mode of deposit.  The bank may dispose of these funds in respect of its professional activity, subject to their repayment under the conditions provided in the contract . . . ."  Accordingly, even though "the holder of the account may dispose at any time of the whole or part of the balance" in the account under Article 898, once funds are deposited into a holders' account, the holder simply has a contractual right to receive the funds upon request, not physical possession or even control of the actual funds.  Thus, under Ethiopian law, the plaintiffs simply have an intangible property interest in the funds that were deposited in their bank accounts.  In fact, "intangible property" is defined by the leading American authority on the interpretation of legal terms to include "bank accounts, stock options, and business good-will." Black's Law Dictionary 1233 (7th ed. 1999).

The Court's conclusion that bank accounts constitute intangible property comports with the views taken by other courts, although admittedly in different contexts, that bank accounts are intangible, not tangible property.  For example, the Fifth Circuit noted, in a case involving claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (2001),

_____

of tangible property, because such an interest asserts control over the assets and profits of the company.  Id. at 663.

that "[a] bank account is a debt that a bank owes to the depositor.  Thus, it is closely analogous

to . . . 'intangible rights, such as contract rights . . . .'" Guidry v. Bank of LaPlaceu, 954 F.2d

278, 283 (5th Cir. 1992) (citation omitted); see Connecticut Bank of Commerce v. Republic of

Congo, 309 F.3d 240, 259 n.8 (5th Cir. 2002) (describing bank accounts as a form of intangible

property).  Moreover, the Ninth Circuit has noted that "assets are now held in the form of

fungible intangibles such as bank accounts, money market accounts, and securities." Washington

Legal Found. v. Legal Found. of Washington, 271 F.3d 835, 878 (9th Cir. 2001); see Keller v.

Bass Pro Shops, Inc., 15 F.3d 122, 125 (8th Cir. 1994) (quoting Brown on Personal Property §

1.7, at 11 (3d ed. 1975) ("[b]ank accounts, debts generally, corporate stock, patents and

copyrights are common instances of this class of [intangible] property")).  In addition, in the

bankruptcy context, bank accounts are considered intangible personal property.  See, e.g., In re

Oakley, 344 F.3d 709, 711 (7th Cir. 2003) ("a bank account, corporate stock, Treasury note or

other bond, or promissory note, is intangible property . . . ."); In re: Keith, 2004 WL 2126346, at

*3 (Bankr. W.D. Mo. 2004) ("a bank account . . . constitute[s] intangible personal property").

This Court can fathom no reason to conclude that bank accounts in the FSIA context should be

viewed any differently than bank accounts in any other context.  Thus, this Court concludes that

the plaintiffs' CBE bank accounts are a form of intangible property, and accordingly, this Court

does not have subject matter jurisdiction in this case under the FSIA.[4]

## 2.    Is the Property "Owned or Operated" by Ethiopia or CBE?

---

[4] The papers submitted by both parties focus solely on the bank accounts as the property that has allegedly been taken and remains in that status.  Despite allegations in the complaint that the plaintiffs' real property, i.e., their homes and businesses, were also illegally taken, there is no discussion of whether these tangible properties provides the basis for FSIA jurisdiction.  Presumably these properties have not been discussed by the plaintiffs because they have been sold, and the proceeds from the sales have been placed in the plaintiffs' bank accounts, thereby making the taking of the bank accounts as the only property that would form the basis for this Court to have FSIA jurisdiction.

In order for this Court to have subject matter jurisdiction pursuant to § 1605(a)(3) of the FSIA, in addition to establishing an illegal expropriation, a plaintiff must also establish a jurisdictional nexus between the alleged expropriation and the United States. Peterson, 332 F. Supp. 2d at 197. As already discussed, this nexus can be established "by showing that the property at issue or any property exchanged for it: (a) 'is present in the United States in connection with a commercial activity carried on in the United States by the foreign state,' or (b) 'is owned or operated by an agency or instrumentality of the foreign state and that the agency or instrumentality is engaged in commercial activity in the United States.'" Id. at 197-98 (quoting 28 U.S.C. § 1605(a)(3); Lord Day, 134 F. Supp. 2d at 560. Here, the plaintiffs claim they satisfy the latter jurisdictional nexus requirement. Pls.' Opp'n at 23-31. However, contrary to the plaintiffs' contention, they have failed to satisfy this prong of § 1605(a)(3) because they have offered no evidence to establish that either Ethiopia or the CBE owns or operates the plaintiffs' bank accounts that are the subject of this action.

Few courts have undertaken the task of interpreting the phrase "owned or operated" as used under § 1605(a)(3), but those that have provide helpful guidance. For example, the Fifth Circuit in Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne De Navigation, 730 F.2d 195 (5th Cir. 1984) concluded that the "owned or operated" requirement mandates more than merely having possession or control of the subject property. Id. at 204. Rather, property is owned or operated if the foreign government or instrumentality of the foreign government assumed control over the property and used it for the benefit of the government or the instrumentality. Id. In Vencedora, the Fifth Circuit rejected the view that "'own' or 'operate' may mean 'possess' or 'control,'" concluding that the vessel at issue there "would have been

owned or operated under § 1605(a)(3) if [the instrumentality of the Algerian government] or

some Algerian agency had assumed control of the vessel and had used it to carry oil for the

benefit of the Algerian government." Id.  In reaching this conclusion the court looked to the

legislative history of the FSIA which "indicated that section 1605(a)(3) was intended to subject

to United States jurisdiction any foreign agency or instrumentality that has nationalized or

expropriated property without compensation, or that is using expropriated property taken by

another branch of the state." Id. (citing 1976 U.S. Code Cong. & Ad. News 6604, 6618).

And a district court in the Central District of California, relying on Vencedora, concluded

similarly that the phrase "owned or operated" required a showing that the property was used for

the benefit of the government which allegedly expropriated it.  Greenpeace, Inc. v. State of

France, 946 F. Supp. 773, 784 (C.D. Cal. 1996).

   The plaintiffs argue that the CBE owns and operates the bank accounts because they have

exercised control, power and influence over the accounts.  Pls.' Opp'n at 23.  The plaintiffs opine

that the CBE has exercised control over the accounts, and thus ownership of them, because the

plaintiffs are unable to withdraw funds from their accounts.  Id.  Moreover, the plaintiffs assert

that the CBE "operates the funds and accounts" by investing the money from the accounts and

acquiring as profit the difference between the return on that investment and the interest that

normally accrues to the accounts.  Id.  Contrary to the plaintiffs' argument, however, the

plaintiffs' property is not owned or operated by either the CBE or the Ethiopian government for

several reasons.

   First, it is important to reemphasize what property is at issue.  As already discussed,

Article 896 of the Ethiopian Commercial Code states, "[t]he contract of deposit of funds renders

the bank owner of the funds deposited, irrespective of the mode of deposit.  The bank may

dispose of these funds in respect of its professional activity, subject to their repayment under the

conditions provided in the contract . . . ."  Thus, the plaintiffs' property is a contract right as a

depositor, not the actual funds that were originally deposited into the accounts.  The funds, once

deposited, become the funds of the bank, subject to the account holder's contract rights.  This

finding comports with this Court's earlier holding that a bank account is intangible property.

And this distinction, contrary to the plaintiffs' contention, is critical.  So, rather than having

property rights in the deposited funds, the plaintiffs' property rights are actually the contractual

rights they possess to have those funds returned to them.  Accordingly, to establish that the CBE

or the Ethiopian government own or operate the plaintiffs' property, the plaintiffs must establish

that the CBE or Ethiopia have assumed control over these contract rights and used them for their

own benefit.  But they have failed to make such a showing.

       The plaintiffs' position is predicated on a belief that when funds were deposited into their

accounts, they still have property rights in those funds.  However, as already discussed, the

property rights the plaintiffs possess is the contract right to the repayment of those funds.  In fact,

the Ethiopian Commercial Code makes it perfectly clear that once deposited, the bank becomes

the owner of the funds until the funds are repaid to the depositor.  Thus, any investment or use of

the funds by the CBE or the Ethiopian government has not offended the plaintiffs' property rights

since those funds, until they are repaid, are owned by the bank, not the plaintiffs.  Thus, because

the plaintiffs' argument is based on a false proposition, the argument fails as a result of its flawed

foundation.  In fact, the plaintiffs do not even argue that their contract rights as depositors are

somehow owned or operated by the CBE or the Ethiopian government.  Thus, the plaintiffs'

14

claim that the defendants own or operate their property has no merit.

In any event, even if this Court could disregard this fatal flaw in the plaintiffs' argument, their claims still would fail because they have not offered any evidentiary support for their arguments.  The various declarations cited to by the plaintiffs, Pls.' Opp'n at 23 n.73, contain no discussion of the CBE's ownership or operation of their bank accounts.  Rather, the parts of the declarations cited by the plaintiff discuss the CBE's alleged commercial activity in the United States through various correspondent banking relationships.   Moreover, the plaintiffs' argument, while using terms like "control," "power" and "influence," simply assert arguments clearly rejected by the Fifth Circuit and the District Court for the Central District of California. Although using additional terms as support for their position, the plaintiffs' argument amounts to a claim that the CBE and the Ethiopian government possess and control their bank accounts. Such claims, however, are insufficient to satisfy the "owned or operated" requirement of the FSIA.  The plaintiffs here, although claiming a right to a different type of property, are really in positions no different than the plaintiffs in Vencedora and Greenpeace, who were similarly denied access to their property.  And this Court is not convinced that there is any reason to depart from the persuasive rulings in those cases.

Finally, there is simply no evidence in the record, other than the plaintiffs' unsubstantiated assertion, that the CBE and the Ethiopian government have benefitted from maintaining these accounts.  But even if they have, this does not aid the plaintiffs' cause because, as already noted, the CBE, under the Ethiopian Commercial Code, became the owner of the funds once that were deposited into the accounts.  So unless investment of those funds and the retention of the profits derived from the investments conflicts with the contractual rights of the

plaintiffs, any benefit obtained from the use of the funds has no bearing on the Court's analysis.

For all of the reasons set forth above, the plaintiffs have failed to establish that this Court has

jurisdiction under the FSIA.

## IV.   <u>Conclusion</u>

For the foregoing reasons, this Court cannot exercise subject matter jurisdiction over this

action pursuant to the § 1605(a)(3) of the FSIA.  Accordingly, the defendants' motion to dismiss

is granted.[5]

**SO ORDERED** on this 8th day of November, 2005.[6]


REGGIE B. WALTON
United States District Judge

---

[5] Because this Court has concluded that the FSIA does not confer subject matter jurisdiction on it, it need not address the defendants' other arguments for dismissal, including dismissal based on the remaining prongs of § 1605(a)(3), the Act of State Doctrine and this Court's lack of personal jurisdiction.

[6] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.